Good morning, Your Honors. Sean Garrison, on behalf of the appellant ASU, I would hopefully like to reserve approximately one minute of time for rebuttal. All right, I'm sure we'll give you that amount of time, so thank you. Thank you. May it please the Court, as this Court has long recognized, the right to a The District Court deprived ASU of that right by dismissing its complaint without notice and without any opportunity to be heard. Well, let me, that's, I know, but just to your argument, we don't know, so let's just jump to that. You're arguing that the District Court erred by dismissing the complaint suespontant without giving you notice and an opportunity to respond. So if the District Court had granted an opportunity to amend the complaint, what, if anything, would have changed? Well, in terms of, necessarily, I think there are two issues. One is, if we had the opportunity to be heard, we would be able to have addressed the other errors that we believe existed in the Court's analysis, number one, that could have changed his opinion. Number two, with potential other evidence that could be introduced in support of the case. Evidence such as, perhaps, testimony of students that actually saw these Instagram posts, the testimony of the alumnus whose tweet was included as part of the record, who was indeed confused as to whether or not... So Mr. Garrison, are you suggesting that the District Court should have given you a hearing on the default judgment? Is that what you're suggesting? I'm suggesting that before dismissing the complaint, the District Court should have at least given us the opportunity to submit a brief and or have a hearing to discuss that issue with him. But at a minimum, we should have had the opportunity to submit a brief as to why dismissal at this stage of the case was not appropriate. So, just to be clear, is your position that even if it would be futile, you still have A for you to amend? You still just basically need to have that procedural right or do you agree that if we were to conclude that it would have been futile for you to amend? I'm not asking you to agree that it would have been futile, but if it would have been, then There was sort of no error here, or at least excusable error, and we could affirm. Well, the question here, and I think the wrinkle, of course, is that we're also in a situation of default judgment. And so, from the 12B6 standard of plausibility, I think the complaint most certainly meets that standard. When you then layer on the top of that the fact that we're in a procedural situation where the defendant defaulted, and therefore, all of the allegations of the complaint must be deemed to be true with respect to, for example, that this was a commercial use of the mark. In this case, I think you're answering a slightly different question. So, let's assume for a second, I'm not asking you to agree to this, but assume that we don't agree with you on that and that it was in it, and we also think that amending would have been futile. You couldn't have fixed anything. Are you saying that you just have a procedural right to have that hearing or something before your case is dismissed, even if it's futile? In other words, like the judge made some sort of procedural mistake here that doesn't really turn on any of the merits or anything of your case? I think it does turn on the merits, but I would... If it is futile, then you would say, okay, well, no harm, no foul. Well, I would point you to the Ninth Circuit case, the Harmon case in 1962, where this court said that the court cannot know without hearing the parties whether it may be possible for an appellate to state a claim to relief, however strongly it may incline to believe it cannot. And I think that's really the fundamental issue here, is regardless of what the district court's thoughts were at the moment as to how strong the case may be, we were entitled to that opportunity. And I just want to make clear, if we're talking about it, I'm talking about if it's clear down here at the very bottom, futile to... You don't disagree, it sounds like, that if it really was... The case, not your case, let's talk about some other case, some case where it really was futile to... Then you would... You don't think you would... That we would not need to overturn that case. Yes, and the cases, by way of example, where that has come up, for example, are where it's purely a question of law or a matter of statutory interpretation where the court has said in those instances, maybe it's harmless error or no error in that instance because there really was not a need to further consider factual issues or things of that nature. In this particular case, by dismissing it at the time that he did... Well, here's just an interesting case because you're right, it's not totally a matter of law. It turns on, I think, this district court judge and his view, and arguably a lot of people's view, that nobody could possibly be confused by this, right? So you're right, it's not a matter of law, but do you think that a case... Again, not your case, but a case could ever be so clear that nobody could be confused? Somebody tweeting something that somebody said, I think this... Somebody could think this was the president, but nobody would ever think that this was the president or something. Like no one would ever think that you were having a party at the consulate of Belarus. Well, I would challenge that because we have to keep in mind, I might not believe that, you might not believe that, Your Honor, but we have to keep in mind who the target audience for these posts were. College students. 18, 19-year-old college students, but not just college students generally. College students that had been cooped up in their house through this pandemic for months were then returning to campus in search of any form of really resocialization, being able to get together. Well, let's talk about the elephant in the room here, right? And I've been a regent at two different universities, so I certainly understand that perspective. You got someone complaining that this is just, they're going to pull off their sticker or, you know, that because this is just a horrible, and the regents obviously, you know, have, they're at the top of the pyramid to protect the university, and we're in the middle of a pandemic, and people are, you have a policy about masks and all of that. Why isn't this, you know, there's certain things in this that someone could believe that it's just a parody, it's hyperbole, that there's no truth to it, and people at that point are beside themselves, that we're wearing masks, not wearing masks. And I think you make some claim of commercial speech, which you might want to address, but why isn't this just someone popping off saying that the university has ridiculous policies about And even though the regents don't really want to hear it, that it's speech, I think we're probably going to hear something about that, I'm guessing, that it's speech, and you know, sometimes free speech means you got to hear things that you don't want to hear, and so then you come up with this idea that it's somehow a trademark case, and everyone looks at it and goes, what? So why isn't it, why isn't it futile when you look at it that way? Because it's not just about speech. Because when this account was first created, it was about promoting a party. That's what it was. And on the record, the owner of this account claimed to be an event party planner, indicated that there was going to be a party created, indicated that there would be profits generated from this party. And counsel, there was never, there was, you know, it's interesting because your complaint as I read it had, I think, maybe a line or two only on that topic. And in fact, when you made your demand letter to Facebook, they refused to take it down because it wasn't a fact argument and doesn't, in fact, reflect the gravamen of your complaint. No, I don't think that's correct. I don't think it was a question of commercial or not from Facebook's standpoint, but I don't think that's binding here in any event. I think the key point, actually, is this account was launched to promote a party. None of the criticism, none of the quote unquote speech that we're talking about as it relates to ASU came into play until ASU announced that it was moving forward to enforce its rights against this account. Only then, Dr. Callahan, can I ask you one quick before you run out of time? No, you've got time. Okay, real quick, because your amicus is about ready to stand up and argue here and they've got all kinds of arguments that they've raised, that the parties haven't raised. So I'm kind of curious as to your view, can we, I mean, we've got Eugene Valle here who's got all kinds of interesting First Amendment ideas that, can we entertain those or can we not? I would say no, Your Honor, because none of them were raised below and none of them fell below. But it's a little bit odd if we would rule in your, you know, if there is a First Amendment problem, like if you're trying to use trademark to squelch, very important speech, obviously, here. You know, and if we were to just ignore those sort of things and grant you the relief you're asking for, wouldn't that, I mean, that would be kind of odd that we would, that we would trespass on important First Amendment rights just because whoever wrote this, these only person that wants to talk about it is amica. The defendant did have every ability and right to come and defend and raise those issues. Well, okay, but let's say it was a student and you could hunt that person down, then do you hunt that person down or do you expel them from the university? Because, I mean, if it's free, if the person has a right to say it, then the university could expel them. But then we have another lawsuit. So, doesn't it matter whether it's free speech or not? It's not about expelling anyone. It's about protecting. Well, you don't know who he is, so you can't expel, or maybe it's a woman. But it's about protecting the use of the marks in connection with someone promoting a party. The use of the mark once, right? It was just used once. No, it was used multiple times. It's used in the Instagram handle, ASU COVID Parties. It's used repeatedly tagged underneath some of the posts as Arizona State University. It's used in the initial posts, including the trade dress of the university as well. It was used repeatedly, not just once. Well, let's just assume, you'll get some rebuttal time, but I think that this issue is obviously a little meatier than 10 minutes each side. But let's assume that even though it didn't come forward as a First Amendment case, but let's assume that if the panel believed that it was protected speech, and that the lawsuit is just really, is there to chill First Amendment speech, why shouldn't that be considered as, that it would, in terms of determining futility? If it is purely protected speech, if we determined that, hypothetically, if we determined that, then isn't, doesn't it follow that it's futile? Well, if you've determined that it is not commercial, then there is not a claim to be made under the Lanham Act. That certainly is true. But I would submit that based on the record before the court, which the court has to follow the record, is an admission because of the default judgment, that indeed this was a commercial venture, that indeed the defendant was planning to have a party, that indeed they were using their agency. Does it say anything that he was planning to raise money for it? Yes, it does. Where? There is the post that indicates that the profits from the party would be raised to fund hydrochloric lint to be provided to other parties. So there's a direct mention of profits. And on the state of this record, in the procedural posture of this case, that has to be credited. Is there anything in the record that indicates that the university wants to know who this person is? Yes, there is, because we made efforts to obtain who it was so that we could better pursue the case. Go after that person? Is that a, can you go after that person? No, not at all. To enforce the trademark? Sure. And let me just address this whole issue that's been raised, that somehow all we're trying to do is squash speech of students or anyone else. There are multiple examples out there where no one was indeed hawking a good or a service using the marks, but were criticizing the university. The university has not gone after them at all and would not have the right to do so, certainly under trademark challenge. I think the reason there was never a party was just because you guys jumped on this right away. I mean, the reality is obviously the district court judge thought that all of this talk about the Belarus, Belarus, whatever it's called, and the partnering with an Israelite company, Israeli company, and this is all just some board, obviously not worked hard enough ASU student sitting in a dorm room somewhere saying crazy stuff, right? Everybody seems to think that except for you all. I think that we can't obviously take the chance that that's not true. We don't know whether a party actually occurred or not. What we do know is we think it's 95% true and 5% chance that they were really like planning to have a big commercial party and do this stuff. What does that mean? If it's 95% true that this is not commercial and this is just bad parody or whatever, what does that mean for purposes of what we should do with this case? Well, as this court has also said, the crime of parody does not eliminate the trademark infringement claims. There's good parody. There's bad parody. It can still be confusing. And so the question still has to be an analysis of whether or not there's a likelihood of confusion in the end. Okay. Do either of my colleagues have any additional questions right now? No. Okay. Well, we've taken you over considerably. But I will give you at least two minutes for rebuttal. Thank you, Your Honor. Okay. Thank you. All right. We'll hear from Amiki or Amicus or wherever you are. Good morning. Good morning, Your Honor. So how come it's Eugene Mullen? We have his name for the record. We have a very, very excited panel. Can you tell us your name first? My name is Max Lymes. I'm a student of Professor Volokh's at UCLA. You're representing Amicus in defense of the judgment rule. Okay. So the question is sort of a threshold question is how come it's Eugene Volokh instead of UCLA, as I was confused about that too. Does UCLA kind of agree with the issue on this? Oh, well, Your Honor, I'm not quite sure. UCLA, the administration's position on this. Okay. Well, talking from the peanut gallery generally isn't allowed. Okay. Thank you. Your Honors, beyond quarrel, the idea that Joe defaulted and he admitted the facts contained in the board's allegations, but he didn't default. He didn't admit to the board's legal conclusion that he was engaged in commercial speech. And this court may determine from the pleadings that both that Joe was not engaged in commercial speech and that his speech was not likely to pose confusion to Instagram users. Addressing first the threshold issue of whether a dismissal is appropriate or without notice, this court has in various cases affirmed district courts who have dismissed complaints sui sponte without notice in Omar v. Wall. What's your best case that if we looked at this and said that this was futile, what's your best case that would say the district court could sui sponte dismiss it? There are two, Your Honor. One would be Omar v. Sealand and another, Wall v. Bell, in both cases. Because the plaintiff could not possibly win relief on its claim because an amendment would be futile, the court dismissed sui sponte without notice. They didn't rely in Omar on the fact that it was an issue of juris statutory interpretation. That's not a distinction this court relied on in that case. It's not one that would make much sense given that in Tawambli and Iqbal, the Supreme Court has authorized dismissals on the basis of factual impossibility. And in this case, the board was given an opportunity to be heard on its claims. In presenting its motion for default judgment, the board had to present the very same arguments that it would have to present in order to withstand a motion to dismiss. Many courts have characterized default judgment motions as a reverse motion to dismiss. This court in Itel v. McCool, two of the most important factors in this court's analysis are the sufficiency of the plaintiff's complaint and the merits of their claim. Well, were they ever specifically given the opportunity to say, this is what we would allege if given the opportunity? Accepting that, okay, they didn't, that it wasn't enough, were they ever given that opportunity to say that they could state a cause of action and what they would, how they would, how their amended complaint would look? Well, they were, Your Honor, on, you mean after the district court dismissed or at what point? Well, at any point in time. Were they ever given an opportunity to say, well, if you don't think we've made it here, this is what we would say? Well, on appeals, certainly, they addressed many of our arguments that we raised once we were brought on the case. And I would just stress again that they were on notice of the fact that they had to present arguments, the same arguments that a plaintiff tried to withstand a motion to dismiss would have to. Well, but there is argument you heard this morning, it's not even just arguments, but it sounds like you may have a long line of students that they could have deposed or somehow testify and say they were confused by this. But they were ready to go to the party. They were ready to go to the party and they found out it wasn't an issue and they probably withdrew and they've lost tuition fees and all that stuff. Well, in a situation such as this, I would stress again that the pleadings themselves are so implausible that the court did not err in dismissing without allowing the board to get these students to testify. And the board had an opportunity to say that they had students who were willing to testify and to point to a specific. It's a little bit odd because, you know, you've got a district court judge and perhaps many people would look at this and say nobody could see this and actually think it's actually the university. But you have the university's counsel saying, no, I think people would be confused by that. Do you hear what I'm saying? That's smart. So how do we draw that distinction? What standard do we use to decide who's right, the district court judge or university's counsel, and whether or not these impressionable 18, 19-year-old students would be led astray by these posts? We also had an alum that reached out and apparently was hotter than hot over I'm taking off my sticker, I'm doing, you know, I'm never talking to you again. Or it could have been hypothetically someone that's given a million dollars and said I'm not, if you allow, if you have, if you as a university associate with this, you've lost me. I mean, if an alum was confused, then why wouldn't a student be confused? Well, your Honor's even for credit that this Twitter post was actually from an alumnus. The standard this court is applying here is not whether any one individual might be confused, but whether a reasonable, in this case, a reasonable Instagram user would be confused. And I would, we would submit that looking at those posts, even a reasonable college student would not be, would not believe that those, that those accountants in any way endorsed or sponsored by ASU. And I would recall, Your Honor, to the beginning of the pandemic in the summer of 2020, at that period even schools that turned out to be lax or on COVID restrictions, even they were enforcing social distancing requirements and imposing mask mandates, the state of Arizona, in fact, required that. And no reasonable Instagram user, not even a college student, would think that ASU would have an account titled ASU underscore COVID parties. So you're saying not even a college student, so you're kind of buying into his view that, you know, these are young, impressionable 18, 20 or 18, 19-year-olds. But I think my kids would say, who are writing that, they would say that if this was a Facebook user, that yes, the fact that they were young would show that they were, but young people actually are very savvy, is my understanding, with Instagram. So perhaps maybe it's the opposite, where maybe the alumni would be confused, but not a young person because they're used to going through Instagram and seeing stuff like this. Oh, no, exactly, Your Honor. And college students, as you said, are very savvy and do frequently use Instagram. They would know that this couldn't be anything but a parent. What if you've got some poor 49-year-old, since that's how I am, that doesn't know anything about Instagram and just gets on it and gets confused? So if this was not commercial speech, because we agree that there's no way you could think of this, but somebody is actually as confused by it who is an older person who isn't savvy about Instagram, what does that mean for purposes of their claim? Well, I would submit that that older Instagram user is not familiar with the, you know, the lingo and the format of some Instagram posts. That wouldn't change ultimately analysis here. This court, even in the context of standard likelihood of confusion analysis, in Toyota versus Tabari, this court noted that the reasonable Internet user is becoming savvier. They realize that when a plaintiff's business or entity's name appears in a defendant's domain name or their website, that doesn't automatically mean that they're associated. So even if this Twitter user was not savvy and couldn't get, didn't get those jokes, that wouldn't alter the analysis. And I would stress again. So those are the people that, that's their donor base, right? So you can see where the university have got. We're not so worried about the students being confused, but we are worried about our donor base who may not be very savvy on Instagram and just learn about this because somebody posted to their Facebook feed. Well, your honor, I would say two things to that. First, this one instance of confusion, even if we're crediting that this was an alumnus, that this court has found that when a plaintiff points to only several instances of confusion, that could be de minimis relative to the. Let's talk about your First Amendment arguments because your brief does raise several that were not raised before the district court. So I think Judge Van Dyke alluded to earlier, should we consider these arguments here because they weren't raised previously? And then I, after you talk about that, if there's, I'm curious if you stated it wasn't commercial speech, tell me why, if it's just pure speech, how we should look, how that could factor into our decision. Does that factor into the futility? If we looked at it, we said, well, this is obviously protective speech, so I don't care about whether this trademark is just, what is it? Is it a wolf in sheep's clothing or something? I don't know. So tell us why we should consider them in the first place, because they weren't raised below, and then how it should factor into our analysis if we can consider it. Well, as to your first question, Your Honor, this court can affirm on any grounds fairly supported by the record below. And because this court has affirmed finding as a matter of law in trademark cases that confusion is unlikely and in landmark cases finding that speech, determining as a matter of law that speech is not commercial, that Doe might not have raised at each individual argument we're bringing before this court. Counsel, we've gotten in trouble, I think it was at Sinead Smith, we've gotten in trouble before from the Supreme Court for deciding issues that were not raised by the parties here in cases. And that's a little bit of how that applies. It's not always super clear. But what about that concern that you say we can decide on any ground supported by the record, but I think the Supreme Court, again, I think it was Sinead Smith, told us we can't reach out and decide issues that are represented by the party presentation principle, I think it's called. Well, Your Honor, I don't believe Sinead Smith dealt with the unique procedural posture where the party below it defaulted. But this court can, if it wishes to avoid that, it's entirely affirmed. I would also mention that Doe, in his answer, which was striking, did raise First Amendment arguments. However, in whatever profane language he used in that answer. But this court can avoid those constitutional issues just by ruling purely on the commercial speech aspect of this and determining that the Lanham Act does not apply. And that those arguments were raised by the board in its complaints and in its briefs. And then turning to that question of whether the speech was commercial, the board does mention that. One of those posts mentioned distributing the profits from hydroxychloroquine. The board doesn't mention that. The board mentions that at the time. There was a clear, reasonable Instagram users would see that as a clear reference to the ongoing political controversy surrounding President Trump's then endorsement of that treatment. And that was the only mention of profit in the post at all. And the only mention of the location of the party was the concert of Belarus, as Your Honor's mentioned. Any reasonable Instagram user, a college student or an alumnus, would realize that the concert of Belarus is highly unlikely to be having AFC students partying there. Could I ask just one question on the commercial point? And that is, with respect to confusion, is it confusion of anybody and everybody, or only the people who are supposed to be participating in the alleged commercial activity? That is, were the alumni supposed to be going to the party, or how does that work? Well, Your Honor, the relevant confusion here, it's only confusion that's tied to the defendant's commercial use of goods and services. So it would be, if Delaware was actually throwing parties, it would be those prospective party goers, in this case the college students. That would be the relevant market for the confusion. That only shows the flaw in the board's argument here. The line of math doesn't target confusion in the air.  The board's seeking to use the line of math to vindicate what is fundamentally not a commercial interest. It's a reputational interest. It might be apprehension that some people were thinking at that point in the pandemic that AFC wasn't being responsible with regards to COVID-19. Give me an example of what would have made it commercial. What would make something commercial in your view? Well, had there been evidence of Dell providing actual plausible information as to the location and the time and the price of parties? If they had tickets, if they were selling tickets. If there were tickets, if he provided a payment mechanism, if he put his Venmo account or other means for payment in his Instagram account, if he was soliciting funds. But he did none of these things. And this court has held that where there are no logistical details as to the good or service, that speech is not commercial. And the board does. And while there are certain cases where this court has found speech to be commercial without those logistical details, those cases would involve the image advertising, where an already existing business is cultivating goodwill in the community by posting about its products. So tell me, you mentioned President Trump and the hydro. Temporarily, when this, where was that controversy relative to when this tweak happened or when the Instagram happened? Well, Your Honor, the Instagram posts were getting around the summer of 2020 in July. I apologize. I don't know when exactly President Trump's statements about hydroxychloroquine were. When he made those statements, I do believe they were, it was before that in the spring of 2020, but I did provide a supplemental briefing on that. So you're saying contextually it would have been happening, and that would be more likely that someone would look at this as a reference to the debate that was ongoing about this, not really a fundraiser to raise, to send them to countries that needed it. Yes, exactly, Your Honor. And that contextual analysis is only supported by those other rhetorical flourishes in his posts. He's accusing the ASU president and chancellor of being a furor. He's comparing ASU and their policies to various totalitarian countries. He's also saying in various posts, he's saying they are trying to slander this account. They are using false positives to push their agenda. He's indicating to users in the clearest terms that he is a separate entity from ASU. So do we look at, what are we supposed to look at? Do we look at, like, a post in isolation, or do we look at, like, the entirety of the post? Because it seems like the posts do, as they go on, get more and more clear that that's the case. I suppose the very first post, the one that actually says ASU on it, can we just look at that one, or do we look at all of them? We would, for purposes of confusion, whether some would be confused that this is ASU. Even if Your Honors were to look at that first post in isolation? No, I'm not. It's actually a different question, which is, which do we do? I don't need your argument as to why that first post is not confusing. I understand that. But would it be proper to just look at the first post? A user might only ever see that post, right? They may not be seeing all the posts. Right. We would submit that Your Honors should assess the Instagram account as a whole, because that's the only, when analyzing likelihood of confusion, because that's the only, an Instagram user couldn't look at any individual post and find the information that the board claims that Dill was trying to provide, information as to price or service. Well, is your argument better that no one was confused if we only look at the first post or if we look at all of them? When is it more obvious, from your perspective, that no one's confused? Well, I would grant that it's more obvious in the later posts when he's making all these accusations of Nazism against the board, but even that first post alone, the people viewing the post in that format would see the account name ASU under smart COVID parties. They would see that, they would know that the university is not likely to make hay of COVID at that point. And also, more fundamentally, even if a user, a naive, not tech savvy user, would be confused at that point looking at that initial post alone, that's still not trademark actionable confusion. There has to be, in this court's initial interest confusion cases, this court has found that where the defendant has no way to capitalize on that initial confusion, the adoption doesn't apply. There's no argument, Sanders. The first post doesn't have any arguable commercial activity. Okay. Unless my colleagues have additional questions, we've taken your way over. Any additional questions? No. All right. Thank you. That will conclude your argument. Thank you, Sanders. All right. I will give you a starter of three minutes for rebuttal. And then if we have more questions, you'll have more questions. I will gladly answer any questions that any of you have. Let's start with, are we limited to looking at the first? Or do we look at all of the Instagram? I think the answer to that question lies in part of the problem with the posture and the dismissal of the case. One of the things that we were deprived of being able to introduce into the record is evidence on exactly that point, how would consumers perceive in the marketplace, which is how this has to be analyzed, these Instagram posts. We'll answer the question. You have to look at them independently. Can we look at all of them? You can look at all of them, yes. But you cannot make a determination that that is what the relevant consumer would have seen and would have informed their ultimate view as to whether or not they were confused. Dr. Gonzalez, I'm sorry, I stepped on you. Go ahead. No, I had the same question you did. We're good. Okay, so when you get to the point of the Durfurer and all of that, how would someone think that was the university talking? I don't know that they would. I think that more goes towards the delusion part of the claim, so not a question of so much of confusion, but just the damage to the reputation through the delusion of the use of the marks. Clearly, Doe here chose the ASU mark to capitalize on that goodwill that's associated with that, to draw attention to their account, to draw attention to the fact that they were promoting this party. It only counts in the same sense that anybody who, I guess you could always say anybody who's using somebody's mark in order to go after them from a speech perspective, to criticize, is capitalizing. You know, if you're attacking any company, you know, Nabisco or whatever, and you say you put on earth so you can talk bad about Nabisco, but now you're in free speech. If that's all that Doe was doing, that would be one thing, but it wasn't. He started this account to promote a party and promote his event. Let's say I believe that and I really want to go to this party. I mean, I have to keep trying to find this party, and then you come across all the other stuff. You might. You might. But, again. Well, there's nothing in it. Go ahead. It's fine. Sorry. I was just going to. You know, we talked about this very first post. What in that very first post, what are the elements of commercialization? If we just look at that one in isolation. If you looked at that one in isolation, it is the beginning of a post to offer this party. So, it might be similar to a billboard that's put up that says coming soon. Right? There does not have to be indicia in each individual post of how much is it going to cost, where can I go. Okay, but do you then concede or not concede that that post alone is insufficient to be commercial? I'm trying to understand your position. The additional information would be needed. I do. I do want to address two points that Mr. Himes raised. First, on the issue of actual confusion. And, Judge Gonzales-Rogers, this goes to a question that you had raised about the scope of confusion. This court has indeed recognized in the Reardon versus Reardon case, which is cited in our brief, that evidence of non-consumer confusion is still relevant to the likelihood of confusion analysis. And so, that does bring us back to what is the state of the record here. So, all of this talk about what consumers or what college students, how they may have interpreted this or not, there really is no evidence in the record to be able to make that evaluation. The one piece of evidence that's in the record as it relates to confusion is the tweet from the alumnus who was confused. That evidence is most certainly relevant. And when we then take into account the Rule 12b6 standard, is this complaint plausible, I think it has to be undeniable that if this account could confuse this one person, it at least makes the complaint plausible, because evidence of actual confusion is the most powerful evidence of likelihood of confusion when it exists. There isn't an argument here that somehow this evidence is de minimis, because we're in a very short period of time of any of this happening, and Facebook took the account offline as soon as the lawsuit was filed. So, the fact that there isn't more evidence right now is not a negative with respect to the strength of ASU's case here. And, in fact, that is one of the other errors that the district court made below in terms of its handling of this evidence. Not only did it not credit it, not only did it not view it in the light most favorable to ASU, it attacked the evidence, and then it performed this calculation that's completely out of bounds in terms of the Ninth Circuit law on actual confusion to support its ultimate conclusion that confusion was not likely, by saying that, oh, well, there's one evidence, one instance of evidence of actual confusion, and hundreds of thousands of alumni worldwide, and so it would be de minimis. That's not allowed, that kind of calculation under this court's jurisprudence with respect to actual confusion, and really demonstrates the fact that the district court did not follow the proper analysis and policies under Rule 12b-6 to look at all of the allegations and the evidence in the light most favorable to ASU. And that's why we submit, dismiss, or should. Well, I want to thank both of you for your arguments in this very interesting case. We always welcome law students, and as I said, we had law students yesterday, and you have now done something that I never did in my career. You've argued before the Ninth Circuit, so that, and so you can swim with the big fish now, and we'll welcome you back when you're a lawyer, and we, I appreciate, I can speak on behalf of the panel, that we appreciate both of you being here and being prepared, and being helpful to us in deciding this case. So, thank you, and this matter will stand submitted, and the court is in recess for the week. Thank you. All rise. Thank you. Thank you both. Thank you. This court for this session stands adjourned.
judges: CALLAHAN, VANDYKE, Rogers